J-S16004-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                     :         PENNSYLVANIA
                                     :
            v.                      :
                                     :
                                     :
RAMEEZA S. CHOWDHURY       :
                                     :
           Appellant          :    No. 577 MDA 2017
                                     :

Appeal from the Judgment of Sentence March 16, 2017
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0001172-2014

BEFORE: BOWES, J., MURRAY, J., and PLATT*, J.

MEMORANDUM BY BOWES, J.:               **FILED AUGUST 15, 2018**

     Rameeza S. Chowdhury appeals from the judgment of sentence of six to eighteen years imprisonment imposed following her non-jury trial convictions for three counts of unlawful administration of a controlled substance by a practitioner, two counts of racketeering, and one count each of conspiracy, perjury, insurance fraud, and hindering prosecution. We vacate the insurance fraud conviction, affirm the remaining convictions, and remand for resentencing.

     The instant crimes arose from an investigation by the Office of the Attorney General into Berks Psychiatry ("BP"), a medical office headed by Doctor Mohammed Khan. The Commonwealth received information that patients could walk in to BP and receive prescriptions for certain controlled substances with little if any medical examination. A search warrant was

_____

*   Retired Senior Judge assigned to the Superior Court.

executed on October 16, 2012, resulting in the seizure of numerous records and approximately seven million dollars in cash. The lead investigator, Michael Golebiewski, determined that Dr. Khan unlawfully prescribed approximately 145,000 pills from January 1, 2012, through October 16, 2012.

Appellant, BP's office manager, was charged as an accomplice to Dr. Khan with respect to prescribing three controlled substances (Xanax, Adderall, and Ritalin). In addition, the Commonwealth filed several charges particular to Appellant as a principal, which encompassed fraudulent billing, racketeering, perjury, and hindering prosecution. Briefly stated, the theory for the fraud charges concerned Appellant's involvement with falsifying documentation. The testimony indicated that patients who received Medicare would be seen for ten or fifteen minutes by the therapists, but the billing sheets would state the patients were seen for forty-five minutes. Additionally, Medicare would be billed for separate visits on different dates, *i.e.*, one day with the therapist and one day with Dr. Khan, when, in reality, the patients saw both persons on the same day. Several BP witnesses testified that Appellant ordered the alterations.[1]

The final two charges, perjury and hindering prosecution, concerned a grand jury investigation initiated following execution of the search warrant. Appellant and several other BP employees were subpoenaed to testify. One

_____

[1] The Commonwealth charged Appellant with insurance fraud for these actions, and concedes that the conviction for this crime must be vacated as Medicare does not qualify as an "insurer" for purposes of the charged statute.

employee, Gina Talarico, agreed to record conversations with Appellant. The Commonwealth introduced transcriptions of two conversations, which occurred on October 30, 2013, and October 31, 2013, as well as emails that Appellant sent after the recorded conversations, directing Ms. Talarico to give certain answers. Appellant testified at the grand jury proceeding that she did not speak to other employees regarding what they should say at the hearing.

Appellant was convicted of all charges, and the trial court thereafter imposed the aforementioned sentence. Appellant's post-sentence motion was denied, and a timely notice of appeal followed.[2] Appellant raises seven

_____

[2] The Commonwealth writes:

> [Appellant]'s brief indicates that she has appealed from the trial court's Order dated March 16, 2017 imposing sentence. Because she filed a March 27, 2017 post-sentence motion for relief, her appeal must be from the trial court's final order denying that motion on March 28, 2017. ***See***, ***e.g.***, ***Commonwealth v. Rojas***, 874 A.2d 638, 642 (Pa.Super. 2005). An appeal from an interlocutory, non-final order such as the trial court's March 16, 2017 sentencing order must be quashed on jurisdictional grounds. ***Id***. The Commonwealth is willing to give [Appellant] the benefit of the doubt that her erroneous statement regarding the order appealed from constitutes an inadvertent misstatement that should not be viewed as depriving this Court of jurisdiction.

Commonwealth's brief at 3 n.2. ***Rojas*** discusses this Court's jurisdictional ability to address an appeal while a post-sentence motion remains pending before the trial court. That issue is not involved herein, since Appellant did not file her notice of appeal until after the trial court denied her post-sentence motion. Thus, Appellant properly appealed from the judgment of sentence imposed in open court on March 16, 2017, as made final by the denial of post-sentence motions. ***See Commonwealth v. Chamberlain***, 658 A.2d 395, 397 (Pa.Super. 1995) ("[An] order denying post-sentence motions acts to

separate claims on appeal, which, for brevity's sake we shall not reproduce, as the questions quote large portions of the statutory language for each crime and would encompass several pages of text. Each of Appellant's claims challenges the sufficiency of the evidence supporting the verdicts for the six discrete crimes at issue.[3] Our standard of review is well-settled, and we apply the following principles.

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

***Commonwealth v. Williams***, 176 A.3d 298, 305–06 (Pa.Super. 2017)

(citations and quotation marks omitted).

---

finalize the judgment of sentence for purposes of appeal. Thus, the appeal is taken from the judgment of sentence, not the order denying post-sentence motions.").

[3] Racketeering (counts one and two), unlawful distribution of controlled substances (three, four, and five), criminal conspiracy (six), perjury (seven), insurance fraud (eight), and hindering apprehension (nine).

The distribution of controlled substances crimes charged at counts three, four, and five lie at the heart of this case, and we therefore commence our review by discussing those convictions. The statutory language reads:

> (a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:
>
> . . . .
>
> (14) The administration, dispensing, delivery, gift or prescription of any controlled substance by any practitioner or professional assistant under the practitioner's direction and supervision unless done (i) in good faith in the course of his professional practice; (ii) within the scope of the patient relationship; (iii) in accordance with treatment principles accepted by a responsible segment of the medical profession.

35 P.S. § 780-113(a)(14).

Appellant does not dispute that Dr. Khan committed the aforementioned crimes.[4] The question is whether Appellant was connected to Dr. Khan's illicit activity to a degree that she is also criminally culpable. Appellant was doubtlessly involved insofar as she directed and managed the office, but the parties question the inferences that may reasonably be drawn from her actions in that capacity.

The trial court found Appellant guilty based on accomplice liability. The Crimes Code defines that type of liability as follows:

---

[4] Dr. Khan pleaded guilty at CP-06-CR-000706-2012 to one count of unlawful administration of controlled substances in violation of 35 P.S. § 780-113(a)(14), insurance fraud, and conspiracy.

**(c) Accomplice defined.--**A person is an accomplice of another person in the commission of an offense if:

> (1) with the intent of promoting or facilitating the commission of the offense, he:
>
> > (i) solicits such other person to commit it; or
> >
> > (ii) aids or agrees or attempts to aid such other person in planning or committing it[.]

18 Pa.C.S. § 306(c)(1). Our Supreme Court has explained that accomplice liability requires satisfaction of two prongs:

> First, there must be evidence that the defendant intended to aid or promote the underlying offense. Second, there must be evidence that the defendant actively participated in the crime by soliciting, aiding, or agreeing to aid the principal. While these two requirements may be established by circumstantial evidence, a defendant cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. There must be some additional evidence that the defendant intended to aid in the commission of the underlying crime, and then did or attempted to do so. With regard to the amount of aid, it need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime.

*Commonwealth v. Murphy*, 844 A.2d 1228, 1234 (Pa. 2004) (citations omitted).

Appellant maintains that she was not Dr. Khan's accomplice because she was merely the manager of the practice who did little more than run a tight ship, and she analogizes her participation to mere presence and knowledge. "The most damning inference that can be drawn from these facts is that [Appellant] was on a mission to run an efficient medical practice, as was her

duty as the Officer Manager[.]" Appellant's brief at 25. Appellant identifies a number of facts that she contends undercut the inference that she intended to aid Dr. Khan in the commission of these offenses, namely that Dr. Khan's illegal practices predated her employment at BP. Additionally, she highlights that there was no apparent motive, as reflected by the absence of evidence tying her to the profits generated by the increased business.[5]

We find that the Commonwealth presented sufficient evidence to affirm the trial court's conclusion that Appellant acted as an accomplice, and we reject Appellant's fundamental assertion that her role in Dr. Khan's crimes was limited to running an efficient practice. We agree with the Commonwealth that the evidence overwhelmingly demonstrates that Appellant structured BP's practice to enable Dr. Khan's criminal behavior. The Commonwealth called several witnesses who described Appellant's role in not only increasing the number of illegitimate prescriptions, but actively preventing legitimate medical treatments.

Cynthia Cruz, a therapist employed by BP, testified how medical treatment should occur in "a perfect world." The first time a patient visited the practice, a therapist would see the patient for an initial discussion and

---

[5] The Commonwealth conceded the lack of evidence of a motive during its closing argument. "She ran [BP] with an iron fist. Why, when she wasn't making any money? I don't know that answer. I don't have to prove motive. I can't know why someone chooses to do what they do." N.T., 3/8/17, at 229.

psychiatric evaluation. The patient would then be put on an appointment calendar for regular visits. At the second visit, the patient would see the doctor, who would perform an initial evaluation. Finally, on the third visit, the doctor would determine if medication was warranted, with further follow-up as needed. N.T., 3/8/17, at 35. The doctor would not meet the patient on the same day as a therapy session, but would review the therapist's notes and speak to the therapist if necessary before prescribing any medication. As we shall detail, BP's operations fell well short of those ideals.

We do not, of course, suggest that any deviation from that scenario warrants a finding of criminality. However, BP's operation, as described by Ms. Cruz and others, was so dysfunctional and divorced from good faith medical practice that the label "pill mill" is well-deserved. Ms. Cruz stated that patients were seen for as little as ten minutes, and that the "overall essence of [BP] was that, [*sic*] to get them in and to get them out[.]" *Id*. at 36. Ms. Cruz stated that Appellant put pressure on her to see more patients, and ordered Ms. Cruz to alter medical logs "to match what the doctor wrote." *Id*. at 41. Thus, the therapy notes were written to match the prescribed medication, "rather than the other way around." *Id*.

Bolaji Owoloja, a nurse practitioner who worked at BP, stated that all the patients she saw were on medication, which she believed to be medically unnecessary. She voiced her concerns to Appellant, and informed her that she intended to wean some of the patients off medication. Appellant "wasn't

- 8 -

pleased with that suggestion," and told Ms. Owoloja that she "should not change whatever Doctor Khan prescribes." *Id*. at 79. Appellant told Ms. Owoloja that she spent too much time with the patients, and pressured her to see more patients so that the practice would make more money. *Id*. at 83.

Nan Kurlancheek, a clinical social worker, testified that she became the licensed clinical supervisor after Dr. Khan was fined $250,000 in 2009 following an audit. She was supposed to supervise all of the therapists. Appellant, who joined BP approximately six months after her, attempted to take over Ms. Kurlancheek's role and hired therapists without her consultation or input. Appellant also implemented, over Ms. Kurlancheek's objection, a policy that BP would see walk-in patients five days a week. That policy increased business to the point that "[t]here were lines outside the building" on occasion. *Id*. at 112.

Gina Talarico, the aforementioned therapist who recorded conversations with Appellant, similarly stated that the office was chaotic and could not medically accommodate the sheer number of patients. She was responsible for seeing twenty or more patients a day, with approximately one hundred people in the waiting room. *Id*. at 125.

Taken together, the evidence established that Appellant managed the office's day-to-day business to aid Dr. Khan's ability to write large numbers of medically-unnecessary prescriptions. Tellingly, patients with insurance, who were a source of greater profits for the practice, were seen by therapists, while

cash patients were immediately funneled to Dr. Khan. That fact alone tends to establish that Appellant aided Dr. Khan in prioritizing the distribution of pain medication over legitimate medical treatment. Moreover, when therapists took too long with a patient, Appellant pressured them to move the patients along to Dr. Khan for prescriptions. "Accomplice liability may be established wholly by circumstantial evidence. Only the least degree of concert or collusion in the commission of the offense is sufficient to sustain a finding of responsibility as an accomplice. No agreement is required, only aid." *Commonwealth v. Mitchell*, 135 A.3d 1097, 1102 (Pa.Super. 2016) (quotation marks and citation omitted). We find ample evidence to support accomplice liability for these three crimes.

We now address the closely-related question of whether the Commonwealth presented sufficient evidence that Appellant conspired with Dr. Khan to do the above, as charged at count six. "Conspiracy requires proof of an additional factor which accomplice liability does not—the existence of an agreement." *Commonwealth v. McClendon*, 874 A.2d 1223, 1229 (Pa.Super. 2005) (citation omitted).

We note that Dr. Khan's unlawful prescriptions apparently predate Appellant's employment with his practice. However, "A conspiracy can form after one of the actors begins committing a substantive crime[.]" *Commonwealth v. Chambers*, --- A.3d ----, 2018 WL 3455394, at *7 (Pa. July 18, 2018). The focus is on whether the parties had a common plan,

- 10 -

agreement, or understanding, and we find the Commonwealth established that Appellant and Dr. Khan formed a conspiracy.

In this regard, we incorporate the foregoing discussion with respect to the existence of an agreement in terms of circumstantial evidence. We fully agree with the trial court's observation that "It beggars belief that an individual would conduct such transparent fraud in the clinical area of the practice, without the express approval of and in agreement with the head doctor." Trial Court Opinion, 6/21/17, at 8. While circumstantial evidence alone can suffice, we note that there is some direct evidence that Dr. Khan and Appellant were acting in concert.

Particularly, Ms. Owoloja testified that, on one occasion, she decided to speak to Dr. Khan about her concerns that the patients were overmedicated. Dr. Khan said he would look into it. Shortly thereafter, a memo written by Dr. Khan was circulated stating that patients meeting certain parameters would be weaned off medication. Ms. Owoloja started following that procedure, and Appellant told Ms. Owoloja that her patients were complaining as they wanted their medication. We quote Ms. Owoloja's testimony on this point:

> [Appellant said] nobody wants to see you. Everybody [is] not happy because you['re] weaning them off the medication. You are not - - - I said well, that is the agreement. I'm just following the memo. So I said, okay. Who are the people? She's like there is a chart this high, no one wants. Let me see the charts. And then she went up front. She couldn't produce any one for anyone that doesn't want to see me. And I said, you know what, that's fine. You can reschedule those people with Doctor Khan, but I will not give – write those medications for them.

So she wasn't – well, you have to see them.  We are losing money.  I said, well, it is about my license.  It's not about money.  Well, she was just not happy.

*Id*. at 80-81.  On cross-examination, Ms. Owloja was asked if Dr. Khan, who wrote the memo, undid the policy.  She replied, "Between the two of them they undid the policy."  *Id*. at 93.

Additionally, Gina Talarico testified that a memo was issued at one point explaining that any patient with a controlled substance prescription could no longer be seen monthly and had to be seen on a more frequent basis.  Appellant created signs to display in the lobby stating that certain days were reserved for certain prescriptions: "[Appellant] hung a sign up saying Xanies and Benzos, I don't know, Monday and Wednesday, whatever the day was."  *Id*. at 128.  This evidence combined with the circumstantial evidence sufficed to establish a conspiracy to unlawfully prescribe controlled substances.

We now address the crimes of racketeering, charged at counts one and two as separate violations of the corrupt organizations statute.  The pertinent language reads as follows:

**(b) Prohibited activities.—**

. . . .

(3) It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

> (4) It shall be unlawful for any person to conspire to violate any of the provisions of paragraphs (1), (2) or (3) of this subsection.

18 Pa.C.S. § 911(b).

The only elements that Appellant challenges are whether (1) her actions constituted a "pattern of racketeering activity", and (2) whether she was employed by the enterprise. Her argument in support largely tracks the foregoing arguments.

> [Appellant] asserts that the evidence is insufficient to support her convictions where it failed to establish that she had a knowledge or intention to be involved in a corrupt organization. As argued previously, [Appellant] asserts that the Commonwealth has failed to prove beyond a reasonable doubt that she had any intention of aiding Dr. Khan in unlawfully prescribing controlled substances, only in aiding him in running an efficient medical practice.

Appellant's brief at 32.

Appellant's argument is little more than a repackaging of her claims that she was neither an accomplice nor conspirator in Dr. Khan's crimes. For the reasons set forth at length regarding accomplice liability, we find that the Commonwealth established a pattern of racketeering activity. The definitions section for corrupt organizations includes "an offense indictable under . . . The Controlled, Substance, Drug, Device and Cosmetic Act (relating the sale and dispensing of narcotic drugs)." 18 Pa.C.S. § 911(h)(1)(ii). Thus, the three counts of unlawful distribution of narcotics, which we have affirmed under accomplice liability, qualify as a pattern of racketeering activity in which she is culpable.

In **Commonwealth v. Dellisanti**, 876 A.2d 366 (Pa. 2005), our Supreme Court applied § 911 and determined that four sales of drug paraphernalia from a retail store constituted a pattern of racketeering activity. As to "enterprise," the Court held as follows: "We find that it is obvious that Dellisanti's store was a legitimate business entity engaged in commerce. Therefore, the 'enterprise' requirement of the Act is satisfied." The same is true herein. Appellant asserts that she was not part of the criminal aspect of the "enterprise" but, again, that is simply an alternative way of asserting that she was not part of the pattern of racketeering activity.

Turning to the separate crime of conspiracy under § 911, our discussion of conspiracy under 18 Pa.C.S. § 901 similarly applies. Since Appellant conspired with Dr. Khan to commit the controlled substance offenses, she likewise conspired to violate the racketeering act. Hence, no relief is due.

Next, Appellant challenges the conviction for perjury at count seven. The crime of perjury is established by evidence that "in any official proceeding [the person] makes a false statement under oath or equivalent affirmation, or swears or affirms the truth of a statement previously made, when the statement is material and [the person] does not believe it to be true." 18 Pa.C.S. § 4902(a). Falsity cannot be established by the uncorroborated testimony of a single witness. 18 Pa.C.S. § 4902(f).

Appellant's conviction was based upon her grand jury testimony, which we reproduce in relevant part:

Q. Have you suggested answers to any staff members, current or former, for them to give to the investigators or the Grand Jury?

A. No.

Q. Meaning have you attempted to coach them in their answers?

A. No.

Q. Any staff members?

A. No.

Q. Have you and any other staff member, current or former, compared potential answers to Grand Jury questions?

A. Grand Jury questions?

Q. Yes, potential Grand Jury questions.

A. No.

Q. Have you and any staff member, current or former, compared potential answers to investigators' questions?

A. No, because we didn't really know who met with who [*sic*].

N.T., 3/8/17, at 720-21 (Commonwealth's Exhibit C-6) (photocopy of grand jury transcript).

To establish the falsity of these statements, the Commonwealth introduced the wiretap recordings made by Ms. Talarico prior to Appellant's grand jury appearance. In those conversations, Appellant repeatedly instructed Ms. Talarico to give certain answers. For example, Appellant told her, "[Y]ou have to say that Dr. Khan told you guys to see the patients the day before. That's what I'm going to say. Dr. Khan told you guys to see the patients on the same day, I mean different day." *Id*. at 572 (Commonwealth's Exhibit C-3). Appellant added, "We're going to talk about what you have to

- 15 -

say." *Id*. at 573. Appellant followed these conversations with an email sent to Ms. Talarico, which stated "Gina – be careful – I think my thing sounds better – say that 'Mrs. C. [Appellant] & Connie both told us to do therapy and med check on the same day and same superbill, bec[ause] that is what I will say.'" *Id*. at 765 (Commonwealth's Exhibit C-7) (photocopy of email).

The Commonwealth asserts that Appellant has waived her challenge to the perjury conviction. In her concise statement, Appellant alleged that the Commonwealth failed to produce sufficient evidence because she "did not testify before the grand jury in a manner that was materially false and could have affected the outcome of the proceeding[.]" Concise Statement, 4/26/17, at 3. In her brief, however, Appellant offers a different argument. She now argues that she interpreted the prosecutor's question to only encompass coaching for "nefarious purposes." Appellant's brief at 36. Additionally, Appellant emphasizes that the Commonwealth's perjury conviction rests on a credibility determination. Appellant claims that she was, in fact, telling the truth on the tapes when she told Ms. Talarico things like, "Don't say [I] said to change the date, because I did not." N.T., 3/8/17, at 574. As set forth *supra*, Ms. Talarico and other witnesses testified to the contrary. According to Appellant, her perjury conviction rests upon the trial court's credibility determination. In other words, her "coaching" was not perjury since she told Ms. Talarico to tell the truth, and the falsity of Appellant's statements therefore has not been corroborated.

We agree that Appellant has waived her argument since it bears no resemblance to her concise statement challenge. As the Commonwealth correctly observes, a litigant must "specify the element or elements . . . with regard to which he deems the evidence was insufficient to sustain a conviction." ***Commonwealth v. Roche***, 153 A.3d 1063, 1072 (Pa.Super. 2017). Appellant thus waived her current challenge to the perjury conviction by failing to include it in her Pa.R.A.P. 1925(b) statement.

Nevertheless, we would not give relief even if it were preserved, as we disagree with Appellant's position that the perjury conviction rests on the trial court's credibility determinations. Appellant was asked at the grand jury proceeding, under oath, whether or not she coached witnesses or even compared potential answers with any other employee. Her own words on tape clearly contradict her grand jury testimony. Thus, even if Appellant is correct that every witness lied at trial about her involvement in Dr. Khan's crimes, that conclusion has no bearing on the falsity of her grand jury testimony that she did not compare answers with other employees. Those recordings are corroboration of her perjury. ***See Commonwealth v. Robinson***, 480 A.2d 1229, 1231 (Pa.Super. 1984) ("[The statute] does not preclude a conviction where the only proof of falsity is documentary evidence. Thus, an uncorroborated record of a criminal conviction is sufficient to demonstrate the falsity of a sworn statement that the speaker has never been convicted of a

crime."). We would therefore reject Appellant's challenge to the perjury charge.

We likewise find that the Commonwealth presented sufficient evidence to sustain the charge of hindering prosecution, which states:

> **(a) Offense defined.--**A person commits an offense if, with intent to hinder the apprehension, prosecution, conviction or punishment of another for crime or violation of the terms of probation, parole, intermediate punishment or Accelerated Rehabilitative Disposition, he:
>
> . . . .
>
> (3) conceals or destroys evidence of the crime, or tampers with a witness, informant, document or other source of information, regardless of its admissibility in evidence[.]
>
> . . . .
>
> **(b) Grading.--**The offense is a felony of the third degree if the conduct which the actor knows has been charged or is liable to be charged against the person aided would constitute a felony of the first or second degree. Otherwise it is a misdemeanor of the second degree.

18 Pa.C.S. § 5105.

Appellant argues that the conviction is invalid because "the Commonwealth's proof is lacking as to both the identity of the aided party and the necessary intent." Appellant's brief at 48. She continues:

> Clearly, Dr. Khan is named in the Information as the party [Appellant] allegedly aided. However, at no point during the Bench Trial testimony is the identity of the aided party established. Although it is apparent that a grand jury investigation took place into the inner workings of Berks Psychiatry, any number of individuals could have been aided by [Appellant]'s alleged

- 18 -

interference with Gina Talarico. At best, this omission leaves [Appellant]'s conviction for this offense resting on mere inference.

*Id*. at 48-49.

We disagree. The Commonwealth's case-in-chief in large part focused on the relationship between Dr. Khan's crimes and Appellant's knowledge thereof. Notably, this case was tried before a judge as fact-finder, thus obviating the need for written instructions which, no doubt, would have instructed the jury that the Commonwealth's theory was that Appellant's interference with Ms. Talarico's grand jury appearance was designed to hinder prosecution of Dr. Khan.

In this respect, Appellant's assertion that "any number of individuals could have been aided" by Appellant's interference with Ms. Talarico simply highlights the fact that Appellant's intent was to hinder the prosecution of "another." The Commonwealth was obviously investigating the entirety of BP's operations in order to identify any wrongdoing. We do not doubt that Appellant intended to protect herself and the others in BP by "closing ranks" and presenting a consistent story. However, that simply shows that Appellant's intent was to hinder the prosecution writ large. The fact that Appellant was attempting to hinder the prosecution of **several** people, herself and Dr. Khan included, is hardly a valid defense. As the Commonwealth notes, Appellant told Ms. Talarico, among other things, "don't throw me and Dr. Khan under the bus[.]" We therefore affirm.

Finally, we address Appellant's conviction for insurance fraud at count eight. The relevant text states:

**(a) Offense defined.--**A person commits an offense if the person does any of the following:

. . . .

(3) Knowingly and with the intent to defraud any insurer or self-insured, assists, abets, solicits or conspires with another to prepare or make any statement that is intended to be presented to any insurer or self-insured in connection with, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim, including information which documents or supports an amount claimed in excess of the actual loss sustained by the claimant.

18 Pa.C.S. § 4117.

The Commonwealth states that Medicare does not qualify as an insurer under the statutory definition of that term, and concedes that the evidence is thereby insufficient.[6] We agree, and we therefore vacate the conviction.[7] Since our disposition upsets the trial court's sentencing scheme, we must remand for resentencing.

---

[6] Fraud in connection with programs such as Medicare is separately criminalized. *See* 62 P.S. § 1407.

[7] Appellant argues that the Commonwealth failed to present evidence that she had the requisite intent to defraud. To its credit, the Commonwealth points out an independent flaw in the conviction not identified by Appellant.

Insurance fraud conviction discharged.  Judgment of sentence vacated.

Case remanded for resentencing.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/15/18